## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

**Civil Action No.** 20-cv-02992-PAB-KMT

JUDICIAL WATCH, INC., et al.,

Plaintiffs,

v.

JENA GRISWOLD, et al.,

Defendants.

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO MOTION TO DISMISS

Plaintiffs Judicial Watch, Inc., Elizabeth Miller, Lorri Hovey, and Mark Sutfin ("Plaintiffs") submit this memorandum of law in opposition to the motion of defendants Secretary Griswold and the State of Colorado ("Defendants") to dismiss the complaint. Doc. No. 34.

### Statutory Background

The National Voter Registration Act of 1993 (NVRA) was enacted for two stated purposes: first, to "increase the number of eligible citizens who register to vote" and "enhance[]" their "participation . . . as voters in elections for Federal office"; and second, "to protect the integrity of the electoral process" and "ensure that accurate and current voter registration rolls are maintained." 52 U.S.C. § 20501(b). The NVRA seeks to increase voter participation in several ways. It mandates, for example, that offices providing public assistance accept voter registration applications, and that applications for driver's licenses serve as voter registration applications (giving the law its popular name, "Motor Voter"). 52 U.S.C. §§ 20504, 20506.

The NVRA's second goal, ensuring election integrity and accurate and current voter rolls, is embodied in Section 8, which is the subject of this lawsuit. 52 U.S.C. § 20507. It requires states

to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of … the death of the registrant; or … a change in the residence of the registrant." *Id.* § 20507(a)(4).

The NVRA provides that the registrations of voters who have moved out of a jurisdiction may only be cancelled in two ways. First, those who confirm a change of address in writing are removed from the rolls. 52 U.S.C. § 20507(d)(1)(A). Second, if registrants are sent a "postage prepaid and pre-addressed return card" by forwardable mail seeking address confirmation (the "Confirmation Notice"), fail to respond to it, and then fail to "vote[] or appear[] to vote" for two general federal elections—basically, a period of from two to four years—they are removed from the rolls. *Id.* § 20507(d)(1)(B), (d)(2). A registrant who fails to respond to a notice is said to be "inactive" during the statutory waiting period. 11 C.F.R. § 9428.2(d). Such a registrant may still vote during that period (52 U.S.C. § 20507(e)), which stops the NVRA process and returns the voter to "active" status. But once the waiting period is over, states have no discretion as to whether to cancel a registration. To the contrary, "federal law makes this removal mandatory." *Husted v. A. Philip Randolph Inst.*, 138 S. Ct. 1833, 1841-42 (2018) (citations omitted).

States may define the events that trigger sending Confirmation Notices to start this process, and "States take a variety of approaches." *Husted*, 138 S. Ct. at 1839 (citation omitted). One approach is set out in Section 8(c)—the so-called "safe harbor"—which provides that states "may" meet the "reasonable effort" requirements of Section 8(a)(4) "by establishing a program" using "change-of-address information supplied by the Postal Service" to identify registrants who may have moved. 52 U.S.C. § 20507(c)(1)(A). Those identified are then sent Confirmation Notices. *Id.* § 20507(c)(1)(B)(ii). As discussed in point III *infra*, a safe harbor program only complies with the

NVRA if it is actually used to identify *and* remove registrants who have moved.

Depending on when a violation occurred, a person aggrieved by a violation of the NVRA may be required to provide written notice to a state's chief election official and to wait either 90 or 20 days before bringing a civil suit. 52 U.S.C. § 20510(b)(1), (2). No notice is necessary, however, if a violation occurs within the 30 days prior to a federal election. *Id.* § 20510(b)(3).

### The Allegations in the Complaint

The complaint alleges that Defendants failed to make the reasonable effort required by the NVRA to remove ineligible registrants from state voter rolls. Doc. No. 1, ¶ 73. In support of this claim, the complaint sets forth several different analyses that all point to the same conclusion.

The federal Election Assistance Commission (EAC) is charged by law to issue a report to Congress every two years on the impact of the NVRA. 52 U.S.C. § 20508(a)(3). The states themselves provide the data used in this report. 11 C.F.R. § 9428.7; Doc. No. 1, ¶ 14. Plaintiffs compared registration data from the EAC's 2019 report with the then-most recent census data from the American Community Survey's (ACS) authoritative five-year survey. *Id.* ¶¶ 24, 28. Forty of Colorado's 64 counties (or 62% of them) were found to have registration rates exceeding 100% of their voting-age citizenry. *Id.* When compared with other states, the percentage of Colorado's counties with such unlikely registration rates was the highest in the nation. *Id.* ¶ 29.

In September 2020, Plaintiffs updated this study using the latest ACS five-year data. They compared the data with counties' contemporaneous registration numbers for *each* of the 60 months in that period. *Id.* ¶ 30. As a result, this procedure is not just a "snapshot" at one point in time. The updated study fully confirms Colorado counties' excessive registration rates. *Id.* ¶ 31-35.

Using data Defendants provided to the EAC, Plaintiffs found that 30 Colorado counties

removed less than 1.5% of their registration lists per year under Section 8(d). *Id.* ¶¶ 37-38. They also found that 25 counties sent Confirmation Notices to less than 1% of their registration lists each year. *Id.* ¶¶ 44-45. These low numbers weigh heavily in favor of a finding of non-compliance, especially since 8% to 24% of these counties' residents move each year. *Id.* ¶¶ 40-42; 46-48.

Plaintiffs also analyzed "inactive" registrants—those who did not respond to a notice and are in the waiting period—month by month, from October 2018 through September 2020, a few weeks before filing the complaint. *Id.* ¶ 52. The data came from Secretary Griswold's website. *Id.* The study shows that Colorado's counties carry high percentages of inactive registrations on their rolls. Sixty counties show average inactive rates higher than the national median. *Id.* ¶¶ 53-54. Eight counties show inactive rates at least *twice* as high as the national median. *Id.* ¶ 55.

In sum, the complaint alleges high registration rates in a large majority of Colorado counties. As set forth below, this is a traditional way, recognized by federal courts, to show a likely violation of the NVRA. But the complaint alleges much more, including facts that flatly contradict any notion of compliance. It is simply not possible to comply with the NVRA while removing few registrants, sending few Confirmation Notices, or carrying inordinate numbers of inactive registrants on the rolls. These facts show Defendants are neglecting core statutory responsibilities.

### Standards Applicable to This Motion to Dismiss

On a motion to dismiss under Rule 12(b)(6), a court accepts "as true all well-pleaded factual allegations" and views them "in the light most favorable to the plaintiff."[1] *Smith v. U.S.*, 561 F.3d

---

[1]    Defendants seem to suggest that different standards apply to "statistical analysis." Doc. No. 34 at 4. The cases they cite do not support this suggestion. In *Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038, 1053 (10th Cir. 2020), the issue was not "insufficient" but "irreconcilable, self-contradictory data." In *Doe v. Univ. of Colo.*, 255 F. Supp. 3d 1064, 1079 (D. Colo. 2017), an alternative explanation (to anti-male bias) was "overwhelm[ing]."

1090, 1098 (10th Cir. 2009) (citation omitted). The court "is not to weigh potential evidence," but "to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Id.* (citation and internal quotations omitted).

A motion to dismiss for lack of jurisdiction under Rule 12(b)(1) that only involves "a facial challenge" questioning "the sufficiency of the complaint," is determined by accepting "allegations of material facts as true and constru[ing] the complaint in favor of" the plaintiffs. *U.S. v. Rodriguez-Aguirre*, 264 F.3d 1195, 1203 (10th Cir. 2001) (contrasting motions that contest jurisdictional facts) (citation omitted). Defendants have submitted no affidavits challenging the truth of any jurisdictional facts alleged in the complaint. The instant motion is a facial challenge to jurisdiction, and the usual presumptions governing motions to dismiss apply to it as well.

## ARGUMENT

### I.   Plaintiffs Have Standing.

Plaintiff Judicial Watch is an educational nonprofit, whose mission is "to promote transparency, integrity, and accountability in government and fidelity to the rule of law." Doc. No. 1, ¶ 16. Responding to the concerns of its members, it "commenced a nationwide program to monitor … election officials' compliance with their NVRA list maintenance obligations." *Id.* ¶ 20. It obtains and analyzes public records "from jurisdictions across the nation about their voter list maintenance efforts." *Id.* It has earned a national reputation for doing so. *See Judicial Watch v. Lamone*, 399 F. Supp. 3d 425, 445 (D. Md. 2019) ("Organizations such as Judicial Watch … have the resources and expertise that few individuals can marshal," so that denying it "access to voter registration lists … undermines [the] efficacy" of the NVRA's public records provisions).

Judicial Watch has long been concerned with Colorado's voter list maintenance practices.

These concerns led it to correspond with seven Colorado counties and the Secretary of State in April 2019 seeking list maintenance documents (*id.* ¶ 58); to analyze the results (*id.*); to threaten a lawsuit in December 2019 against Jefferson County and the Secretary (*id.* ¶ 59); to research and analyze the Secretary's response (*id.*); and to conduct the analyses discussed in the complaint (*id.* ¶ 60) including special research into 60 months of registration data (*id.* ¶ 30), Section 8(d) removals (*id.* ¶ 38), Confirmation Notices (*id.* ¶ 45), and 24 recent months of inactive registration data (*id.* ¶ 52). As a result, Judicial Watch "expended substantial resources" investigating Defendants' compliance, communicating with Colorado officials, researching their responses, and talking to concerned members. *Id.* ¶ 61. These resources were "distinct from and above and beyond Judicial Watch's regular, programmatic efforts to monitor" NVRA compliance, and ordinarily would have been spent on "regular, programmatic activities," or not spent at all. *Id.* ¶¶ 62-63.

Accordingly, Judicial Watch has standing to sue as an organization, because it has had to divert its resources in response to Defendants' alleged unlawful non-compliance with the NVRA. "[F]or several decades it has been established that diversion of resources is a cognizable harm in the context of Article III standing analysis." *Colo. v. U.S. EPA*, 445 F. Supp. 3d 1295, 1307 (D. Colo. 2020), citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). On remarkably similar facts, the court in *Am. Civ. Rights Union v. Martinez-Rivera*, 166 F. Supp. 3d 779 (W.D. Tex. 2015) concluded that a plaintiff organization had standing to sue to enforce the integrity provisions of Section 8 of the NVRA. The organization there stated that its "core mission" was "to foster compliance with federal election laws, promote election integrity, and ensure that only eligible voters may participate in American elections." *Id.* at 800. It alleged a diversion of resources from this mission because it had sent a statutory notice letter, conducted discussions over several

months with the defendant, and made a number of visits to the defendants. *Id.* at 789. The district court upheld a finding that the plaintiff had "sufficiently alleged injury in fact and causation" (*id.* at 790), and that the injury would be redressed by compliance with the NVRA. *Id.* at 791.

Defendants fail to mention *Am. Civ. Rights Union* in their motion. They argue that Judicial Watch "identifies no specific activities it has been forced to undertake," and that its claim to have "expended [substantial] resources" to "counteract [Defendants'] noncompliance" is "far too vague" to constitute an injury. Doc. No. 34 at 6. This simply ignores the many, specific activities Plaintiffs alleged (*see supra* at 6). Judicial Watch expended staff time on these activities because Defendants' non-compliance was thwarting its mission. This was the injury alleged in *Havens*, 455 U.S. at 379. Staff (and attorney) time is readily calculated, as in fee applications. By contrast, in *Colo. Taxpayers Union, Inc. v. Romer*, 963 F.2d 1394 (10th Cir. 1992), cited by Defendants, the injury was not calculable. The claim was that the governor improperly employed staff to oppose an initiative, forcing the plaintiff to spend more to support it. *Id.* at 1396-97. It was a "futile act of speculation" to assess any added expense. *Id.* at 1397. The other cases Defendants cite concerned only possible, *future* injuries. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013); *Campbell v. Trump*, No. 17-cv-02455-PAB, 2018 U.S. Dist. LEXIS 154593, at *3 (D. Colo. Sept. 11, 2018).

In any case, "[a]t the pleading stage, an organization need only broadly allege" a diversion of resources. *Am. Civ. Rights Union*, 166 F. Supp. 3d at 788, citing *Havens*, 455 U.S. at 379. "At this stage in litigation, 'general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume[] that general allegations embrace those specific facts that are necessary to support the claim.'" *Id.* at 790 (citation omitted). Given these standards, the complaint amply sets forth Judicial Watch's standing as an organization.

The complaint also alleges that Defendants' failure to comply with the NVRA burdens "Plaintiffs Miller, Hovey, and Sutfin, and [] all individual members of Judicial Watch"[2] registered to vote in Colorado "by undermining their confidence in the integrity of the electoral process, discouraging their participation in the democratic process, and instilling in them the fear that their legitimate votes will be nullified or diluted." Doc. No. 1, ¶ 65. This is a second basis for standing.

The Supreme Court, in *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006), observed that

> Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy. Voter fraud drives honest citizens out of the democratic process and breeds distrust of our government. Voters who fear their legitimate votes will be outweighed by fraudulent ones will feel disenfranchised.

Consistent with this insight, when the Supreme Court upheld Indiana's voter ID laws in *Crawford v. Marion County Election Bd*., 553 U.S. 181, 196 (2008), it credited the State's legitimate, important "interest in counting only the votes of eligible voters." The Court particularly noted that, while "closely related to the State's interest in preventing voter fraud, *public confidence in the integrity of the electoral process has independent significance*, because it encourages citizen participation in the democratic process." *Id.* at 197 (emphasis added).

In *Judicial Watch, Inc. v. King*, 993 F. Supp. 2d 919, 920 (S.D. Ind. 2012), the plaintiffs sued Indiana for failing to conduct list maintenance required by Section 8(a)(4) of the NVRA. Judicial Watch alleged there that its members were injured by "Indiana's failure to comply with the NVRA list maintenance requirements because that failure 'undermin[es] their confidence in the legitimacy of the elections … and thereby burden[s] their right to vote.'" *Id.* at 924. The district

---

[2]    Judicial Watch can raise its members' claims if (1) they would have standing on their own, (2) the interests it seeks to protect are germane to its purpose, and (3) the claim and relief do not require their participation. *Chamber of Comm. v. Edmondson*, 594 F.3d 742, 756 (10th Cir. 2010).

court agreed. Denying a motion to dismiss for lack of standing, it quoted *Crawford*'s admonition that a state's interest in protecting public confidence "in the integrity and legitimacy of representative government" had "independent significance." *Id.* (citations omitted). The court held that "[i]f the state has a legitimate interest in preventing" the undermining of voters' confidence, "surely a voter who alleges that such harm has befallen him or her has standing to redress the cause of that harm." *Id.* The operative facts here are identical, so the same reasoning should apply.

Defendants fail to mention *King* in their motion. Indeed, Defendants do not discuss Plaintiffs' specific allegations concerning loss of voter confidence. They do assert that Plaintiffs allege a "generalized grievance shared equally by all voters." Doc. No. 34 at 6. This misapplies the phrase. A harm is not generalized because it is widespread. If "harm is concrete, though widely shared, the Court has found 'injury in fact.'" *FEC v. Akins*, 524 U.S. 11, 24 (1998). The Court described this conclusion as "particularly obvious" where "large numbers of individuals suffer the same common-law injury (say, a widespread mass tort), or where large numbers of voters suffer interference with voting rights conferred by law." *Id.* The latter example describes this case.[3]

## II.    Plaintiffs Did Not Have to Provide Any Statutory Notice.

The NVRA states that if a "violation occurred within 30 days before" a federal election, an aggrieved person "need not provide notice … before bringing a civil action." 52 U.S.C. § 20510(b)(3). Notwithstanding this plain language, and the fact that Plaintiffs sued 29 days before the recent election, Defendants argue that the NVRA *should* be read to mean that "the exception

---

[3]    However, *Am. Civ. Rights Union*, 166 F. Supp. 3d at 803 & n.18, while accepting standing based on diverted resources (*see* discussion *supra* at 6-7), rejected standing based on a loss of voter confidence as a "generalized grievance," noting its disagreement with *King*. For the reasons stated in the text, Plaintiffs respectfully urge the Court to adopt the relevant analysis from *King*.

[to requiring notice] should only apply when the upcoming election imposes some urgency." Doc. No. 34 at 8. They propose, in effect, to rewrite the NVRA, based on their view that the legislative history reveals Congress' preference that disputes be "resolved without burdensome litigation." *Id.* Even if true—indeed, even if the specific interpretation they favor had been discussed (it was not)—it would not warrant setting aside a statute's plain words. *Lex. Ins. Co. v. Precision Drilling Co., L.P.*, 830 F.3d 1219, 1222 (10th Cir. 2016) ("The plain words and meaning of a statute cannot be overcome by a legislative history"), quoting *Gemsco, Inc. v. Walling*, 324 U.S. 244, 260 (1945).

*Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032 (9th Cir. 2015) rejected an argument like the one Defendants make here. The plaintiffs there took advantage of both the NVRA's 20-day short-notice and the no-notice periods and filed a complaint the day before an election, alleging that Nevada failed to register voters at public assistance offices. *Id.* at 1035-36. Nevada argued "it would frustrate the purpose of the notice provision" to permit complaints within the short- or no-notice periods if plaintiffs "knew about the violations earlier." *Id.* at 1044. The Ninth Circuit conceded that a plaintiff might seek "the short-term benefit of the publicity obtained from filing suit the day before voters go to the polls," but concluded that "we cannot rewrite the statute to avoid this consequence, for the statute expressly permits it." *Id.* at 1045 (citations omitted).[4]

Defendants also argue that Plaintiffs must allege a "discrete violation" within the 30 days prior to an election, but failed to do so. Doc. No. 34 at 9. The Ninth Circuit in *Cegavske* squarely rejected this argument. A plaintiff need only "plausibly alleg[e] that [an] ongoing, systematic

---

[4]     Plaintiffs here *did not* seek the "short-term benefit" of publicity. The complaint was not filed days before the election, no emergency relief was sought, nothing was required of Defendants before the election, and Plaintiffs stipulated to an extension of time to respond to the complaint.

violation is occurring … when the complaint is filed within 30 days of a federal election." 800

F.3d at 1044. For an ongoing violation, it does not matter "whether or not it was 'discrete' during

the period." *Id.* (citation omitted); *accord*, *Voter Integrity Project NC, Inc. v. Wake Cnty. Bd. of*

*Elections*, 301 F. Supp. 3d 612, 618 (E.D.N.C. 2017) (plaintiff who alleged "ongoing violation of

Section 8" could use shorter notice of 52 U.S.C. § 20510(b)(2)). Plaintiffs make the requisite

allegations here. They allege correspondence about Defendants' list maintenance in April and

December 2019. Doc. No. 1, ¶¶ 58, 59. They allege mutually-reinforcing analyses of registrations,

notices, removals, and inactive registrations, which show problems with Defendants' compliance,

as discussed *supra* at 3-4. In particular, they allege high inactive rates based on an analysis of

inactive registrations month by month *for the last two years, ending in September 2020*, right

before this action was filed. *Id.* ¶¶ 52-55. As the Court said in *Cegavske*, "[i]t is impossible to read

these allegations and to conclude that there is no reasonable possibility that some of the violations

Plaintiffs uncovered … were continuing as of the date[] of … the complaint." 800 F.3d at 1044.

## III.     Plaintiffs State a Claim for a Violation of the NVRA.

Allegations of high registration rates have been held to state a claim for a violation of

Section 8 of the NVRA. In *Am. Civ. Rights Union*, the plaintiffs alleged that county voter rolls

"contain more voters registered to vote than there are citizens eligible to vote," and that an

"implausible 105% registration rate gives rise to the strong inference that the Defendant failed to

conduct a reasonable voter list maintenance program." 166 F. Supp. 3d at 793. The district court

held that these allegations stated "a plausible claim for relief" under Section 8. *Id.* Similarly, in

*Voter Integrity Project*, 301 F. Supp. 3d at 618-19, the court denied a motion to dismiss where the

complaint alleged violations of the NVRA's list maintenance provisions on the ground that "the

registration rate in Wake County remains in excess of 104 percent of eligible citizens residing in Wake County." *See also King*, 993 F. Supp. 2d at 921 (complaint alleged "the number of persons registered to vote exceeded the total voting population in twelve Indiana counties").

Yet the complaint here alleges *more* than high registration rates. It alleges that Defendants sent few Confirmation Notices, removed few registrants after the waiting period, and had high levels of inactives. These facts go directly to Defendants' primary list maintenance obligations: compliance with the NVRA *requires* them to send notices and remove inactive registrants. The allegations, moreover, confirm and explain one another: sending few notices *explains* low removal rates, which *cause* high inactive rates, which *explain* high total registration rates.

Defendants argue that "Colorado has availed itself" of the NVRA's safe-harbor provisions. Doc. No. 34 at 11. This argument raises factual matters outside the complaint and is not appropriate to consider on this motion. In any case, compliance with Section 8(c) requires more than simply enacting procedures or getting information from the Post Office. As the Eleventh Circuit noted, "an election official in order to comply with the NVRA and take advantage of the safe-harbor provision must not only identify potentially ineligible registrants using the [Post Office's] database and mailing procedures, *but must also actually remove those ineligible registrants from the rolls*." *Bellitto v. Snipes*, 935 F.3d 1192, 1204 (11th Cir. 2019) (citation omitted) (emphasis added).

In *Voter Integrity Project* it was similarly asserted that the defendants implemented a safe-harbor program. 301 F. Supp. 3d at 620. The court still denied a motion to dismiss. "Given the stage of this proceeding, the court has no information about [the defendant's] compliance with those procedures. Whether [its] compliance is sufficient to satisfy the 'safe harbor' provision is best resolved after further development of the record." *Id.* (citation omitted). Bluntly put, just

- 12 -

because Defendants claim to have a safe-harbor program does not mean they implement and use it. To the contrary, every allegation cited above concerning Confirmation Notices, Section 8(d) removals, and high levels of inactive registrations testifies to the opposite conclusion—that Defendants have *not* fully implemented a compliant safe-harbor program.

Defendants fail to mention *Voter Integrity Project* in their motion. The other arguments they make as to the "implausibility" of Plaintiffs' claims are unavailing. Defendants argue that "the Complaint focuses only on the percentage of voters removed for one specific reason—failure to respond to a confirmation notice and vote in two subsequent federal elections," and "does not address the counties' overall removal rates," including "moved outside the jurisdiction, death, criminal convictions, and others." Doc. No. 34 at 13-14. But it is entirely appropriate for Plaintiffs to focus their complaint on what they can establish Defendants are failing to do—particularly where it concerns one of the largest components of any NVRA program.[5]

Defendants make several blatant attempts to argue facts or the weight of the evidence. Defendants question Plaintiffs' inferences as to removals and notices, arguing that these are "total figures relating to a two-year period from 2016 to 2018," while the EAC's registration numbers are from November 2018. Doc. No. 34 at 14. The ultimate point of Plaintiffs' analysis was to compare removals and notices each year with a reasonable surrogate for registration for the same year. Whether any one month is the best surrogate goes to the weight of the evidence. Indeed, Plaintiffs have calculated these figures in a number of ways they hope to present to the Court;[6] and

---

[5]     Plaintiffs would certainly allege that it *is* one of the largest components of any NVRA program, and respectfully request leave to do so if the Court deems it necessary.
[6]     For example, Plaintiffs have calculated monthly average registration numbers for these years. If the Court deems it necessary, Plaintiffs respectfully request leave to amend to add them.

these may change depending on what is learned in discovery. Defendants also argue that Plaintiffs' figures "fail[] to account for population growth." *Id.* But Plaintiffs identified 30 counties removing too few registrants (Doc. No. 1, ¶ 38), and 25 sending too few notices (*id.* ¶ 45). Are they all growing? These are clearly factual matters that should not be considered on this motion.

Finally, Defendants proffer as an "obvious alternative explanation" for high registration and inactive rates "that Colorado complies with the NVRA and keeps inactive, non-responsive voters on the rolls for two election cycles." Doc. No. 34 at 14. Thus, "Colorado is emphatically *complying* with its NVRA obligations, leading to the statistics cited in the Complaint." *Id.* at 15. Note, however, that Plaintiffs' data is comparative, as when they allege that the "percentage of Colorado counties with registration rates exceeding 100% was *the highest in the nation*." Doc. No. 1, ¶ 29. Does that mean that Colorado is the most compliant state in the nation?

Clearly not. In any case, whether high registration rates are explained by "hyper-compliance" is obviously a question of fact. Courts have rejected this argument on motions to dismiss. *See Voter Integrity Project*, 301 F. Supp. 3d at 619 (the validity of the claim that a "high registration rate" is due to "the two-election cycle waiting period" is "not appropriate for determination at this early stage of the litigation"); *Am. Civ. Rights Union*, 166 F. Supp. 3d at 804 (denying motion despite claim that high rates "are perfectly consistent with adherence to the NVRA because of the suspense list and the requisite waiting times").

## IV.   Sovereign Immunity Does Not Bar a Claim Against the State of Colorado.

Sovereign immunity is abrogated where Congress "unequivocally expressed its intent to abrogate the immunity," and "has acted 'pursuant to a valid exercise of power.'" *Seminole Tribe v. Fla.*, 517 U.S. 44, 55 (1996) (citation omitted). The NVRA authorizes private civil actions,

provides that they may be commenced "in an appropriate district court" (52 U.S.C. § 20510(b)(1), (2)), and is replete with mandates that "each state shall …" take particular actions. *E.g., id.* §§ 20503(a), 20505(a)(1), 20506(a)(1), 20507(a). These establish the *intent* to abrogate. *See Seminole*, 517 U.S. at 57 (relying on "numerous references to the 'State'" in provisions governing suit). The NVRA was enacted under the 14th Amendment. S. Rep. No. 103-6, at 3 (1993). This gives Congress *authority* to abrogate. *Seminole*, 517 U.S. at 59. The NVRA was also enacted under the Elections Clause, which gives "Congress plenary authority over federal elections." *Harkless v. Brunner*, 545 F.3d 445, 454-55 (6th Cir. 2008). Indeed, precisely because state responsibilities for federal elections arise from powers delegated by Congress, and not reserved to the states by the Constitution, state sovereignty issues are less acute in this context. *See U.S. Term Limits v. Thornton*, 514 U.S. 779, 800-05 (1995) (discussing delegated versus reserved election duties). For the foregoing reasons, the State of Colorado is not immune to Plaintiffs' NVRA claims.

For the same reasons, cases holding that sovereign immunity bars NVRA claims were incorrectly decided. *See Krieger v. Virginia*, 599 F. App'x 112 (4th Cir. 2015) (brief, unpublished, non-precedential affirmance of dismissal of *pro se* NVRA suit); *Pub. Int. Legal Found., Inc. v. Bell*, No. 5:19-CV-248-BO, 2019 U.S. Dist. LEXIS 179485, at *5-6 (E.D.N.C. Oct. 16, 2019).

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied.

December 28, 2020.

/s T. Russell Nobile
T. Russell Nobile
Judicial Watch, Inc.
Post Office Box 6592
Gulfport, Mississippi 39506
(202) 527-9866
Rnobile@judicialwatch.org

**CERTIFICATE OF SERVICE**

I hereby certify that on December 28, 2020, I served a true and complete copy of the foregoing PLAINTIFFS' MEMORANDUM IN OPPOSITION TO MOTION TO DISMISS upon all parties through ECF:

Peter G. Baumann
Grant T. Sullivan
*Attorneys for Defendants*

Amanda R. Callais
Gillian Christine Kuhlmann
Lindsey Erin Dunn
Marc. E. Elias
Matthew Prairie Golden
Thomas J. Tobin
*Attorneys for Proposed Intervenors*

                                        */s T. Russell Nobile*