IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 20-cv-02992-PAB-KMT

JUDICIAL WATCH, INC.,
ELIZABETH MILLER,
LORRI HOVEY, and
MARK SUTFIN

       Plaintiffs,

v.

JENA GRISWOLD, Colorado Secretary of State, in her official capacities,
STATE OF COLORADO,

       Defendants.

_____

**ORDER**
_____

       This matter is before the Court on the Motion to Dismiss [Docket No. 34] filed by

defendants Colorado Secretary of State Jena Griswold (the "Secretary") and the State

of Colorado ("Colorado").  Plaintiffs responded, Docket No. 35, and defendants replied.

Docket No. 44.  This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

## I.  BACKGROUND[1]

       Plaintiff Judicial Watch, Inc. ("Judicial Watch") is a nonprofit, educational

organization with the mission of promoting "transparency, integrity, and accountability in

government and fidelity to the rule of law."  Docket No. 1 at 4, ¶ 16.  Judicial Watch is

supported by individuals who become "members" through financial contributions, and

---

[1] The facts are taken from plaintiffs' complaint [Docket No. 1] and are presumed
to be true for the purposes of this order.  *Brown v. Montoya*, 662 F.3d 1152, 1162 (10th
Cir. 2011).

Judicial Watch represents its members' interests.  *Id.*, ¶ 17.  Plaintiffs Elizabeth Miller, Lorri Hovey, and Mark Sutfin are Colorado voters, and Ms. Miller is also a member of Judicial Watch.[2]  *Id.* at 2, ¶¶ 4–7.

Judicial Watch and its members have become increasingly concerned about the nation's voter registration rolls, including whether state and local election officials are complying with the voter list maintenance obligations of the National Voter Registration Act ("NVRA").  *Id.* at 4, ¶ 18.  Members worry that officials' failure to comply with NVRA undermines election integrity by increasing "the opportunity of ineligible voters or voters intent on fraud to cast ballots."  *Id.* at 5, ¶ 19.  In response to these concerns, Judicial Watch began to monitor state and local officials' compliance with the NVRA requirements by "utiliz[ing] public records laws to request and receive records" about voter list maintenance efforts and then publishing the results of the findings.  *Id.* at 5, ¶ 20.

Section 8 of the NVRA requires states to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters" by reason of death or a change in residence.  52 U.S.C. § 20507(a)(4). States may meet this requirement by using the National Change of Address ("NCOA") database to identify registrants who may have moved, 52 U.S.C. § 20507(c)(1)(A), and, if the NCOA database suggests that a registrant has moved, the local election official is to send the registrant a notice ("Confirmation Notice") explaining how the registrant can

---

[2] Elsewhere in the complaint, plaintiffs state that Ms. Hovey and Mr. Stufin are also members of Judicial Watch.  *Id.* at 12, ¶ 64. The Court refers to Ms. Miller, Ms. Hovey, and Mr. Sutfin as the "individual plaintiffs."

confirm the address change, but the state may only remove the registrant if he or she does not respond to the notice and also fails to vote in two general elections.  52 U.S.C. § 20507(d)(1)(B).  This process, the "NCOA Process," is referred to as the "safe-harbor."  Docket No. 34 at 2; Docket No. 35 at 12; *see also A. Philip Randolph Inst. v. Husted*, 838 F.3d 699, 703 n.2 (6th Cir. 2016) ("Because that subsection describes the NCOA Process as one way in which states 'may' comply with their obligation under the NVRA to identify and remove voters who are no longer eligible due to a change of residence, the NCOA Process is sometimes referred to in this litigation as the 'Safe-Harbor Process.'" (citation omitted)), *rev'd on other grounds*, 138 S. Ct. 1833 (2018).

Judicial Watch's analysis of data from the U.S. Election Assistance Commission ("EAC"), Colorado, and the U.S. Census Bureau "shows that Colorado has failed to make a reasonable effort to remove ineligible registrants from the rolls."  Docket No. 1 at 6, ¶ 25.  In summer 2019, Judicial Watch compared the voter registration numbers in each Colorado county reported to the EAC with the "then-most-recent five-year [American Community Survey ("ACS")] estimates of citizen voting-age population for 2013 to 2017," which led Judicial Watch to conclude that "[f]orty of Colorado's 64 counties . . . had registration rates exceeding 100%."  *Id.* at 6–7, ¶ 28.  According to Judicial Watch, the percentage of Colorado counties with registration rates exceeding 100% "was *the highest in the nation*."  *Id.* at 7, ¶ 29.  In September 2020, Judicial Watch "compared the most recent five-year ACS data released by the Census Bureau," from 2014 through 2018, "with the contemporaneous 60 months of registration data," which showed that, in an average month, 20 counties had registration rates exceeding 100%, and 39 counties had rates exceeding 100% during a single month of that period.  *Id.*, ¶¶

3

30–32.

Judicial Watch insists that, if a jurisdiction removes an insufficient number of registration records for voters who do not respond to the address confirmation notice and then fail to vote in two consecutive federal elections, that jurisdiction is not in compliance with Section 8 of the NVRA.  *Id.* at 8, ¶ 36.  According to Judicial Watch's review of EAC data, 30 Colorado counties reported removing fewer than 3% of the registration list, even though Census data shows that 18% of Colorado residents are living in a different house as a year ago.  *Id.*, ¶ 38–39.  In addition, Judicial Watch's review of the EAC data shows that 25 Colorado counties reported sending address confirmation notices to fewer than 2% of their registrants during the time period, even though approximately 13% of Coloradans in these counties were not living in the same house as a year ago.  *Id.* at 9–10, ¶ 45–46.

Furthermore, based on data posted on the Secretary's website, Judicial Watch has determined that Colorado has a high "inactive registration rate," which Judicial Watch concluded by dividing the number of inactive[3] registrations by the total number of registrations.  *Id.* at 10, ¶ 50–52.  While the median inactive registration rate nationwide was 8.3%, 60 of Colorado's 64 counties exceeded that rate and, in eight counties, the rate was 17%.  *Id.* at 11, ¶¶ 53–55.

The individual plaintiffs, and other Judicial Watch members registered to vote in Colorado, are "burden[ed]" because defendants failure to comply with NVRA "undermin[es] their confidence in the integrity of the electoral process, discourag[es]

---

[3] Only "active" Colorado voters receive a mail-in ballot.  Colo. Rev. Stat. § 1-7.5-107(3)(a)(I).

their participation in the democratic process, and instill[s] in them the fear that their legitimate votes will be nullified or diluted." *Id.* at 12–13, ¶ 65.  Defendants' noncompliance, they allege, also "infringes the federal and state statutory rights [of the individual plaintiffs and other Judicial Watch members registered in Colorado] to vote in elections for federal office that comply with the procedures and protections required by the NVRA." *Id.* at 13, ¶ 66.

On December 7, 2020, defendants filed a motion to dismiss.  Defendants argue that plaintiffs "[A] lack of Article III standing, [B] fail[] to allege that statutory notice was provided or excused, [C] fail[] to plausibly allege that Colorado is not conducting a 'reasonable' list maintenance program, and [D] [] the State is immune from suit under the Eleventh Amendment."[4]  Docket No. 34 at 1.

## II.  LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must allege enough factual matter that, taken as true, makes the plaintiff's "claim to relief . . . plausible on its face." *Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th Cir. 2012) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "The 'plausibility' standard requires that relief must plausibly follow from the facts alleged, not that the facts themselves be plausible." *RE/MAX, LLC v. Quicken Loans Inc.*, 295 F. Supp. 3d 1163, 1168 (D. Colo. 2018) (citing *Bryson v. Gonzales*, 534

---

[4] The Court considers Colorado's sovereign immunity arguments first because, if the Court finds that the State of Colorado is immune from suit under the Eleventh Amendment, the Court has no jurisdiction to proceed against the state.  *See Fent v. Okla. Water Res. Bd.*, 235 F.3d 553, 559 (10th Cir. 2000) (Eleventh Amendment "immunity constitutes a bar to the exercise of federal subject matter jurisdiction.").

F.3d 1282, 1286 (10th Cir. 2008)).  Generally, "[s]pecific facts are not necessary; the statement need only 'give the defendant fair notice of what the claim is and the grounds upon which it rests.'"  *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam) (quoting *Twombly*, 550 U.S. at 555) (alterations omitted).  However, a plaintiff still must provide "supporting factual averments" with her allegations.  *Cory v. Allstate Ins.*, 583 F.3d 1240, 1244 (10th Cir. 2009) ("[C]onclusory allegations without supporting factual averments are insufficient to state a claim on which relief can be based." (citation omitted)).  Otherwise, the Court need not accept conclusory allegations.  *Moffet v. Halliburton Energy Servs., Inc.*, 291 F.3d 1227, 1232 (10th Cir. 2002).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief."  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quotations and alterations omitted); *see also Khalik*, 671 F.3d at 1190 ("A plaintiff must nudge [his] claims across the line from conceivable to plausible in order to survive a motion to dismiss." (quoting *Twombly*, 550 U.S. at 570)).  If a complaint's allegations are "so general that they encompass a wide swath of conduct, much of it innocent," then plaintiff has not stated a plausible claim.  *Khalik*, 671 F.3d at 1191 (quotations omitted).  Thus, even though modern rules of pleading are somewhat forgiving, "a complaint still must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory."  *Bryson*, 534 F.3d at 1286 (alterations omitted).

The parties heavily rely on an EAC report, the *Election Administration and Voting*

*Survey: 2018 Comprehensive Report* ("2018 EAC Report"),[5] which is a document outside of the pleadings.  *See, e.g.*, Docket No. 1 at 5, ¶¶ 21–22; Docket No. 34 at 12–15.  Generally, if a court considers matters outside the pleadings in deciding a Rule 12(b)(6) motion, "the motion must be treated as one for summary judgment under Rule 56."  Fed. R. Civ. P 12(d).  However, "if a plaintiff does not incorporate by reference or attach a document to its complaint, but the document is referred to in the complaint and is central to the plaintiff's claim," the Court may consider it on a motion to dismiss.  *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997).  Because the parties rely on the 2018 EAC Report and neither disputes the report's authenticity, the Court may consider the report in resolving defendant's motion to dismiss.  In addition, because the 2018 EAC Report is an official governmental publication, the Court may take judicial notice of it.  *See, e.g.*, *Clappier v. Flynn*, 605 F.2d 519, 535 (10th Cir. 1979).  However, the Court need not take judicial notice of the entire 2018 EAC Report.  *See, e.g.*, *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018) ("Just because [a] document itself is susceptible to judicial notice does not mean that every assertion of fact within that document is judicially noticeable for its truth."); *Crawford v. Countrywide Home Loans, Inc.*, 647 F.3d 642, 649 (7th Cir. 2011) (holding district court did not abuse its discretion in refusing to take judicial notice "not of particular discrete facts, but of a number of whole documents[,]" and questioning "why this would be a matter of judicial notice and not more generally the admissibility of the documents they have identified").

---

[5] This report is available at https://www.eac.gov/sites/default/files/eac_assets/1/6/2018_EAVS_Report.pdf.

## III.  ANALYSIS

### A.  Sovereign Immunity

Colorado moves to dismiss on the grounds that plaintiffs' claim against the State of Colorado is barred under the Eleventh Amendment.  Docket No. 34 at 15.  Colorado states that it is "well established under the Eleventh Amendment that 'an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another state.'"  *Id.* (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984)).

The Eleventh Amendment bars suit against non-consenting states by private individuals in federal court.  *See Bd. of Trustees of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001).  This guarantee applies not only to suits against the state itself but also to suits where "one of [the state's] agencies or departments is named as the defendant." *Pennhurst*, 465 U.S. at 100.  It also applies to citizens of the forum state or citizens of another state.  *Hans v. Louisiana*, 134 U.S. 1, 13–15 (1890).  Furthermore, because the Secretary is a state official sued in her official capacities, Docket No. 1 at 1, the Court must treat a suit against the Secretary as a suit against the state itself.  *See Hafer v. Melo*, 502 U.S. 21, 25 (1991) ("Suits against state officials in their official capacity . . . should be treated as suits against the State."); *see also Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985) (same).  In addition, the Court notes that the Eleventh Amendment bars suit in federal court regardless of the nature of the relief that is sought, *Pennhurst*, 465 U.S. at 100, unless an exception applies.  *See Edelman v. Jordan*, 415 U.S. 651, 673 (1974); *Seminole Tribe v. Fla.*, 517 U.S. 44 (1996).

Plaintiffs argue in response that because the NVRA authorizes private civil

actions to be "commenced 'in an appropriate district court,' . . . and is replete with mandates that 'each state shall . . .' take particular actions," Congress intended to abrogate sovereign immunity.  Docket No. 35 at 14–15.

Two questions, however, must be answered in the affirmative in order for Congress to have properly abrogated state sovereign immunity: (1) Congress must have unequivocally expressed its intent to abrogate sovereign immunity, and (2) in so doing Congress must have acted "pursuant to a valid exercise of power."  *Green v. Mansour*, 474 U.S. 64, 68 (1985).  Plaintiffs' citations to the NVRA's civil enforcement provisions do not demonstrate that Congress, in enacting the NVRA, unequivocally expressed its intent to abrogate sovereign immunity.  The NVRA's general authorization to bring suit in federal court, 52 U.S.C. § 20510(b)(2), "is not the kind of unequivocal statutory language sufficient to abrogate the Eleventh Amendment."  *See Seminole Tribe*, 517 U.S. at 56 (internal quotation and citation omitted).  Plaintiffs' arguments to the contrary are all the more unconvincing when compared with actual instances of Congress abrogating sovereign immunity.  *See, e.g.*, 42 U.S.C. § 12202 ("A State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in Federal or State court of competent jurisdiction for a violation of this chapter.").  As plaintiffs concede, other courts have held that the Eleventh Amendment bars suits against state officials under the NVRA.  Docket No. 35 at 15 (citing *Pub. Int. Legal Found., Inc. v. Bell*, 2019 WL 5290920, at *2 (E.D.N.C. Oct. 17, 2019) (finding that Congress did not abrogate sovereign immunity in NVRA and that state board of elections was immune from suit); *Krieger v. Loudon Cnty.*, 2014 WL 4923904, at *3 (W.D. Va. Sept. 30, 2014), *aff'd sub nom. Krieger v. Virginia*, 599 F. App'x 112 (4th Cir.

9

2015) (unpublished) ("[T]he National Voter Registration Act [does not] contain the requisite language abrogating the state's 11th Amendment sovereign immunity.")).

There is another exception to sovereign immunity, however, that the Court must consider. State officials engaged in ongoing violations of federal law may be sued in their official capacities for prospective relief.[6] *Ex parte Young*, 209 U.S. 123, 155–56 (1908). *Ex parte Young* allows plaintiffs to sue state officials even if the officials claim to be acting under valid state law because, if the officials' conduct constitutes an ongoing violation of federal law, the state "cannot cloak their actions with state authority or state immunity." *Elephant Butte Irrigation Dist. of N.M. v. Dep't of the Interior*, 160 F.3d 602, 609 (10th Cir. 1998). That is, when state officials are arguably violating federal law, "[t]he state is not the real party in interest because the state cannot 'authorize' the officials to violate federal law." *Id.* at 610. Thus, in allegedly violating federal law, the officials are stripped of their state authority and the Eleventh Amendment will not protect them from suit. *Lewis v. N.M. Dep't of Health*, 261 F.3d 970, 976 (10th Cir. 2001).

To determine whether a suit falls within the *Ex parte Young* doctrine, the Court conducts a "straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (citation omitted).

---

[6] Neither party addressed *Ex parte Young*; however, the Eleventh Amendment immunity is jurisdictional. *See Edelman*, 415 U.S. at 678 (permitting state to properly raise Eleventh Amendment defense on appeal after having defended and lost on the merits in the trial court; holding "that the Eleventh Amendment defense sufficiently partakes of the nature of a jurisdictional bar so that it need not be raised in the trial court"). Because Eleventh Amendment immunity is jurisdictional, the Court may consider it *sua sponte*. *See Citizens Concerned for Separation of Church & State v. City & Cnty. of Denver*, 628 F.2d 1289, 1297 (10th Cir. 1980).

This inquiry focuses on plaintiffs' allegations and "does not include an analysis of the merits of the claim[s]." *Id.* at 646. Thus, for the *Ex parte Young* exception to apply, plaintiffs must show that they are: (1) suing state officials rather than the state itself, (2) alleging an ongoing violation of federal law, and (3) seeking prospective relief. *See Muscogee (Creek) Nation v. Pruitt*, 669 F.3d 1159, 1167 (10th Cir. 2012); *Chaffin v. Kan. State Fair Bd.*, 348 F.3d 850, 866 (10th Cir. 2003); *Lewis*, 261 F.3d at 975; *Elephant Butte*, 160 F.3d at 609.

The first prong – whether the plaintiff is suing state officials rather than the state itself – is dispositive and bars plaintiffs' claims against Colorado. One of plaintiffs' claims is without question against Colorado. Docket No. 1 at 1; *cf. Elephant Butte*, 160 F.3d at 609–10 ("The state is not the real party in interest because the state cannot 'authorize' the officials to violate federal law."). The *Ex parte Young* exception to Eleventh Amendment immunity, therefore, does not apply to the plaintiffs' claims against Colorado, and the Court finds Colorado immune from the plaintiffs' suit.[7]

### B.  Article III Standing

The Secretary moves to dismiss for lack of Article III standing. Docket No. 34 at 4. An argument that a plaintiff lacks standing to assert a claim is properly determined pursuant to Rule 12(b)(1) because such argument attacks the Court's subject matter jurisdiction. *See Colo. Envtl. Coalition v. Wenker*, 353 F.3d 1221, 1227 (10th Cir. 2004) (standing is jurisdictional). Rule 12(b)(1) challenges are generally presented in one of two forms: "[t]he moving party may (1) facially attack the complaint's allegations as to

---

[7] Because the Court finds Colorado immune from suit under the first prong, the Court need not consider the second or third prongs of the *Ex parte Young* analysis.

the existence of subject matter jurisdiction, or (2) go beyond allegations contained in the complaint by presenting evidence to challenge the factual basis upon which subject matter jurisdiction rests."  *Merrill Lynch Bus. Fin. Servs., Inc. v. Nudell*, 363 F.3d 1072, 1074 (10th Cir. 2004) (quoting *Maestas v. Lujan*, 351 F.3d 1001, 1013 (10th Cir. 2003)). Ultimately, plaintiff has "[t]he burden of establishing subject matter jurisdiction" because it is "the party asserting jurisdiction."  *Port City Props. v. Union Pac. R.R. Co.*, 518 F.3d 1186, 1189 (10th Cir. 2008).

"The standing inquiry ensures that a plaintiff has a sufficient personal stake in a dispute to ensure the existence of a live case or controversy which renders judicial resolution appropriate."  *Tandy v. City of Wichita*, 380 F.3d 1277, 1283 (10th Cir. 2004). To establish Article III standing, plaintiff must meet three elements:

> First, the plaintiff must have suffered an "injury in fact" – an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'"  Second, there must be a causal connection between the injury and the conduct complained of – the injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court."  Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (citations omitted).  "Injury in fact is a constitutional requirement, and '[i]t is settled that Congress cannot erase Article III's standing requirements by granting the right to sue to a plaintiff who would not otherwise have standing.'"  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547–48 (2016). An injury is particularized if it affects "the plaintiff in a personal and individual way." *Spokeo*, 136 S. Ct. at 1548.  "A 'concrete' injury must be 'de facto'; that is, it must actually exist;" it must be "real," not "abstract."  *Id.*  "If a party satisfies these minimum

12

constitutional requirements, then a court may still deny standing for prudential reasons if the injury alleged constitutes a "generalized grievance" that more appropriately should be addressed by the representative branches." *Colo. Taxpayers Union, Inc. v. Romer*, 963 F.2d 1394, 1396 (10th Cir. 1992) (citing *Allen v. Wright*, 468 U.S. 737, 751 (1984)). "For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth v. Seldin*, 422 U.S. 490, 501 (1975).

### 1. Individual Plaintiffs' Standing

The Secretary argues that the individual plaintiffs have not demonstrated a concrete injury in fact that the Court could remedy.  Docket No. 34 at 4.  Rather, the Secretary claims, plaintiffs have merely alleged that the government has violated the law but that such allegation, without more, is insufficient to confer standing.  *Id.* at 5 (citing *Whitmore v. Arkansas*, 495 U.S. 149, 160 (1990); *Spokeo*, 136 S. Ct. at 1550 (a "bare procedural violation" of a statute is insufficient because it "may result in no harm")).  The Secretary explains that plaintiffs do not allege that they were prevented from voting or that the "purportedly bloated voter rolls" caused delay or mishandling in the transmission or counting of their ballots.  Docket No. 34 at 5.  While plaintiffs do not address the argument that they have alleged only a procedural violation, plaintiffs insist that the Secretary's failure to comply with the NVRA burdens the individual plaintiffs by undermining their confidence in the integrity of the electoral process, discouraging their participation, and instilling in them fear that their votes will be nullified or diluted.  Docket No. 35 at 8 (citing *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 196 (2008)

(noting that public confidence in the electoral process has independent significance)).

The Court agrees that plaintiffs' alleged harm is not the sort of "bare procedural violation" that the Supreme Court found insufficient to confer standing in *Spokeo* because plaintiffs do not merely allege a violation of the law that could result in no harm. *Spokeo*, 136 S. Ct at 1550.

The Secretary also argues that the harm that the individual plaintiffs allege that they faced is a "generalized grievance" shared equally by all voters, which is insufficient to meet the particularized injury-in-fact requirement for Article III standing.  Docket No. 34 at 6 (quoting *Martel v. Condos*, 2020 WL 5755289, at *4 (D. Vt. Sept. 16, 2020) ("If every voter suffers the same incremental dilution of the franchise caused by some third-party's fraudulent vote, then these voters have experienced a generalized injury.")). Judicial Watch disagrees with the Secretary's definition of "generalized grievance." Docket No. 35 at 9.  A harm is not generalized simply because it is widespread, Judicial Watch argues; rather, where large numbers of individuals suffer the same injury, courts have still found an injury in fact.  *Id.*

"The fact that an injury may be suffered by a large number of people does not of itself make that injury a nonjusticiable generalized grievance.  The victims' injuries from a mass tort, for example, are widely shared, to be sure, but each individual suffers a particularized harm."  *Spokeo*, 136 S. Ct. at 1548 n.7.  "Where large numbers of voters suffer interference with voting rights conferred by law," the injury is not impermissibly generalized.  *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 24 (1998).  However, when a plaintiff asserts only a harm to rights shared with every other citizen, the claim falls outside the constitutional constraints on federal jurisdiction.  *Lujan*, 504 U.S. at 573–74;

14

*see also Warth*, 422 U.S. at 499.  Furthermore, plaintiffs "cannot manufacture standing merely . . . based on their fears of hypothetical future harm that is not certainly impending."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013).

The Court addresses each alleged injury in turn.  The Court first considers the individual plaintiffs' allegations that the purportedly bloated voter rolls could lead to fraudulent votes, which could diminish or dilute the individual plaintiffs' votes and have caused such a fear.  The Court finds that this concern is both a generalized grievance and hypothetical.  The alleged injury is a generalized grievance because it is shared equally by all voters.  That is, the potential diminution in the value of each vote is not specific to the individual plaintiffs since they would not be specifically disadvantaged by fraudulent votes any more than other voters would be, even though fraud impacts the final tally of votes.  In *Carney v. Adams*, 141 S. Ct. 493 (2020), the Court considered the arguments of attorney James Adams, who sued Delaware's governor, John Carney, because, as a newly registered political independent, he was precluded from becoming a state judge unless he joined a major political party.  *Id.* at 497.  The Court held that Adams suffered the same, abstract generalized grievance that all citizens of Delaware suffered, i.e., living in a state with, in Adams's view, an unconstitutional judicial selection process.  *Id.* at 499.  The individual plaintiffs' arguments have similar shortcomings.  A fraudulent vote cast in an election would diminish the value of each honest vote equally.  *See, e.g.*, *Martel*, 2020 WL 5755289, at *4.  This is just the sort of grievance that is "plainly undifferentiated and common to all members of the public."  *Lance v. Coffman*, 549 U.S. 437, 440–41 (2007) (quoting *United States v. Richardson*, 418 U.S. 166,

176–77) (1974)).[8]

This alleged injury – that noncompliance with the law could dilute the individual plaintiffs' votes – is also hypothetical.  In *Clapper*, respondents argued that fear of government surveillance caused them to take costly and burdensome measures to protect the confidentiality of their communications.  568 U.S. at 415–16.  The Supreme Court reversed the Second Circuit, holding that the "harm respondents [sought] to avoid was not certainly impending" and was therefore merely a hypothetical future harm.  *Id.* at 416.  The same is true here.  The possibility that the individual plaintiffs' votes – and every other voter's vote in equal measure – *could* be diminished because a fraudulent vote *could* be cast at some election in the future is insufficient to allege a concrete and particularized injury.  Their "subjective fear" of a diminished vote "does not give rise to standing."  *See id.* at 418.

The Court next considers the individual plaintiffs' concerns that noncompliance with the NVRA undermines the individual plaintiffs' confidence in the integrity of the electoral process and discourages their participation.  Docket No. 35 at 8.  The Secretary insists that these purported injuries are also generalized and hypothetical, yet there is no indication that undermined confidence and discouraged participation are "common to all members of the public."  *Lance*, 549 U.S. at 440–41.  Nor are these fears speculative or hypothetical.  The individual plaintiffs are not worried that their confidence *could* be undermined at some point in the future; their confidence is

---

[8] This analysis applies equally to the individual plaintiffs' allegations that the Secretary's failure to follow the NVRA "infringes the federal and statutory rights" of the individual plaintiffs.  Docket No. 1 at 13, ¶ 66.  If the Secretary is not complying with the NVRA, the effect would be the same for all voters.

undermined now.  Unlike in *Clapper*, where the Supreme Court held that plaintiffs failed to demonstrate the future injury that they purportedly feared was certainly impending, 568 U.S. at 409, the injury that the individual plaintiffs have alleged already exists, and the Supreme Court has recognized the "independent significance" of public confidence in the electoral process because it "encourages citizen participation in the democratic process."  *Marion Cnty.*, 553 U.S. at 197. Accepting the allegations in plaintiffs' complaint as true and construing the complaint in favor of plaintiffs, the Court finds that the individual plaintiffs have properly established standing.[9]

### 2.  Judicial Watch's Standing

The Secretary also argues that Judicial Watch does not have standing.  Docket No. 34 at 6–7.  "An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000).  This doctrine is known as "associational standing."  An organization may also have standing to sue on its own to challenge action that causes it direct injury, and the inquiry is "the same inquiry as in the case of an individual."  *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378 (1982).  Organizations may assert standing in their own right when, for instance, a defendant's conduct makes it difficult or impossible for the organization to

---

[9] There appears to be no dispute that the individual plaintiffs' injury is fairly traceable to the purported noncompliance with the NVRA and that a favorable ruling by this Court could redress such an injury.  *See Lujan*, 504 U.S. at 560–61.

fulfill one of its essential purposes or goals, such as when the organization faces a drain

on its resources or when the defendant's actions "have perceptively impaired" the

organization's ability to carry out its mission.  *Id.*; *see also Common Cause of Colo. v.*

*Buescher*, 750 F. Supp. 2d 1259, 1269 (D. Colo. 2010); see also *Charles H. Wesley*

*Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1353–54 (11th Cir. 2005) (an organization

conducting voter registration has a protected interest under the NVRA in having

individuals it registers be processed properly and a state's actions negatively impacting

that interest confer standing on the organization to bring suit on its own behalf).

While the Secretary focuses mainly on Judicial Watch's organizational standing,

the Court considers Judicial Watch's associational standing first.  Because the Court

has found that the individual plaintiffs have standing to sue in their own right, the Court

need only consider whether the interests in the litigation are germane to Judicial

Watch's mission and whether the relief depends on the participation of the individual

plaintiffs.  *See Friends of the Earth*, 528 U.S. at 181.  The complaint seeks to compel

compliance with NVRA, and Judicial Watch's mission is, among other things, to ensure

"fidelity to the rule of law."  Docket No. 1 at 4, ¶ 16.  The litigation is thus germane to

Judicial Watch's mission.  *See, e.g.*, *UAW v. Brock*, 477 U.S. 274, 286–87 (1986)

(finding germaneness where union's constitution stated among its purposes an effort to

work for legislation implementing an effective system of federal unemployment

insurance and suit was to protest regulation that resulted in denial of unemployment

benefits).  In addition, the relief – compliance with the NVRA – does not depend on the

participation of individual plaintiffs because the benefit "will inure to the benefit of those

members of the association actually injured."  *Hunt v. Wash. State Apple Advertising*

18

*Comm'n*, 432 U.S. 333, 343 (1977) (quoting *Warth*, 422 U.S. at 515).  Judicial Watch therefore has associational standing to proceed.[10]

### B.  Statutory Standing

The Secretary argues that the Court must dismiss the case because plaintiffs have not complied with NVRA's notice requirement and, therefore, plaintiffs lack statutory standing.  Docket No. 34 at 7.  The question here is whether plaintiffs "fall[] within the class of plaintiffs whom Congress has authorized to sue" under the NVRA; in other words, whether plaintiffs have a cause of action under the statute.  *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 (2014).

The NVRA requires a person aggrieved by a violation of the NVRA to "provide written notice of the violation to the chief election official of the State involved."  52 U.S.C. § 20510(b)(1); *see also Cromwell v. Kobach*, 199 F. Supp. 3d 1292, 1310 (D. Kan. 2016).  If the alleged violation occurs within 120 days of an election, only 20 days' notice is required; if the alleged violation occurs within 30 days of an election, notice is excused.  52 U.S.C. §§ 20510(b)(2), (3).  When notice is required, the complainant may file suit only if the violation is not corrected within 90 days from the notice.  52 U.S.C. § 20510(b)(2).

Congress intended for the notice requirement to provide states with an opportunity to comply with the NVRA before facing litigation.  *Cromwell*, 199 F. Supp. 3d at 1310 (citing S. Rep. 103-6, at 21 (1993) ("An essential element of an effective civil

_____

[10] Because the Court finds that Judicial Watch as associational standing, i.e., it may proceed in this action on behalf of its members, the Court need not reach the question of whether Judicial Watch also has organizational standing.

enforcement program is a requirement for notice of any complaint regarding its implementation to the appropriate election officials together with a process for its administrative resolution before legal action may be commenced.")); *see also Ass'n of Cmty. Organizations for Reform Now v. Miller*, 129 F.3d 833, 838 (6th Cir. 1997) ("The language and legislative history of [the NVRA] indicate that Congress structured the notice requirement in such a way that notice would provide states in violation of the Act an opportunity to attempt compliance before facing litigation.").  The notice requirement is a pre-requisite to suit that must be pled in order to survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  *See, e.g.*, *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1044 (9th Cir. 2015); *Am. C.R. Union v. Martinez-Rivera*, 166 F. Supp. 3d 779, 806 (W.D. Tex. 2015).  The Secretary argues that, if plaintiffs seek to be excused from the notice requirement, they were required to allege a "discrete violation" that occurred within 30 days of the November 2020 election, which they have not done.  Docket No. 34 at 9.

Plaintiffs contend that notice was excused because the "violation occurred within 30 days before" a federal election, Docket No. 35 at 9 (quoting 52 U.S.C. § 20510(b)(3)), and that plaintiffs need not allege a discrete violation within 30 days to take advantage of the no-notice period so long as the violation is ongoing.  Plaintiffs rely on *La Raza*, where the plaintiffs filed suit the day before an election.  800 F.3d at 1035–36.  The defendants argued that permitting complaints within the short- and no-notice periods would frustrate the purpose of the notice provision if plaintiffs knew about the violations earlier yet simply waited to sue.  The Ninth Circuit, reversing the district court, held that the court could not rewrite the law to avoid this result.  *La Raza*, 800

F.3d at 1044–45 ("The State, like the district judge, is concerned that a plaintiff can avoid giving state officials notice and an adequate opportunity to cure simply by waiting to provide notice until 120 or 30 days before a federal election.  To some degree, we are sympathetic with this concern. . . . This concern, however, does not alter the meaning and operation of the NVRA.").

The law in the Fifth Circuit is similar to the Ninth.  *See, e.g.*, *Scott v. Schedler*, 771 F.3d 831, 834, 840 (5th Cir. 2014) (leaving "intact the district court's determination that the NAACP has complied with the notice requirement" by alleging "systematic and ongoing violations of several provisions of Section 7 of the NVRA").   Though *La Raza* and *Scott* are not directly on point – and not binding on this Court – they are persuasive.[11]  While the Secretary asks the Court to distinguish those cases because they were brought under different sections of the NVRA, the notice provisions in the NVRA are not unique to Section 8.  Rather, the statute is clear that the same notice requirements apply to persons bringing suit because they were "aggrieved by this chapter," not simply by one section.  52 U.S.C. § 20510(b)(1).   "[T]his chapter" refers to chapter 205 of title 52, which includes provisions on simultaneous application for voter registration and application for a driver's license, mail registration, voter registration agencies, as well as federal coordination and regulations.  The Court therefore finds that, while plaintiffs likely could have alerted the Secretary to their concerns earlier and given the Secretary the benefit of attempting remediation or showing compliance before

---

[11] While the Tenth Circuit has not ruled explicitly on this issue, the court upheld the district court's grant of summary judgment to a plaintiff who alleged that New Mexico was engaged in ongoing violations of Sections 7 and 5 of the NVRA.  *See Valdez v. Squier*, 676 F.3d 935, 939 (10th Cir. 2012).

litigation, notice was excused in this case because plaintiffs alleged violation that is ongoing, systemic, and occurring at the time the complaint was filed, which was within 30 days of the November 2020 federal election.  *See La Raza*, 800 F.3d at 1044.

Separately, the Secretary argues that plaintiffs' claims are moot in light of the November 2020 election.  Docket No. 34 at 10.  The Secretary characterizes the notice provision as intended to allow a voter who was wrongfully removed from the voter rolls the ability to challenge the removal before the election.  *Id.*  Once the election has passed, however, the Secretary claims that the "urgency" permitting a plaintiff to forego notice no longer exists because, after the election, the voter could provide notice and be returned to the rolls for the next election.  *Id.*  Given that the Court finds notice was excused in this case, the Court need not address whether plaintiffs should have provided notice after the election.  Such a requirement would be unreasonable where plaintiffs may have already filed a lawsuit against the same defendants to whom they would provide notice.  Nor are the individual plaintiffs' alleged injuries unique to the November 2020 election.

### D.  Failure to State a Claim

Having determined that plaintiffs have both Article III and statutory standing, the Court now considers whether plaintiffs have plausibly alleged a violation of the NVRA. The Secretary argues that plaintiffs' complaint should be dismissed because Colorado is complying with its obligations under the NVRA to remove inactive voters by implementing a "reasonable" program to remove ineligible voters, and this is all that the NVRA requires.  *Id.* at 11.  Colorado's program, the Secretary explains, follows the process provided for at 52 U.S.C. § 20507(c).  *Id.*  As detailed above, this safe-harbor

provision provides that a state may conduct a reasonable program, and thereby meet the list maintenance requirements, by implementing the NCOA Process. Because plaintiffs do not allege Colorado is not following the safe harbor, the Secretary believes plaintiffs have failed to state a claim for relief. *Id.*

Plaintiffs' claims that the Secretary is not complying with the NVRA are based on public records and statistical analysis. Plaintiffs insist that they have shown not only high registration rates, which they claim courts have found indicative of an NVRA violation, but also that the Secretary sends too few Confirmation Notices, removes too few registrants, and has too high a number of inactive voters on the rolls. Docket No. 35 at 11–12.

Assuming plaintiffs' allegations are true, which the Court must at this stage, *see Brown*, 662 F.3d at 1162, the Court finds that plaintiffs have met their burden and have plausibly alleged that Colorado's list maintenance program does not comply with the NVRA. For instance, plaintiffs allege that Colorado has the highest percentage of counties with voter registration rates exceeding 100%. Docket No. 1 at 7, ¶ 29. Judicial Watch reached this conclusion by dividing county registration numbers as published in the 2018 EAC Report with the ACS's estimates of the "citizen voting-age population for 2013 to 2017." *Id.* at 6–7, ¶¶ 26, 28. Plaintiffs insist that this is "an indication" that a jurisdiction is not taking steps to maintain its voting list. *Id.* at 6, ¶ 27. Other courts examining this issue have agreed that a registration rate in excess of 100% may be an indicator of a jurisdiction not making a reasonable effort to conduct a voter list maintenance program in accordance with the NVRA. *See, e.g. Voter Integrity Proj. NC, Inc. v. Wake Cnty. Bd. of Elections*, 301 F. Supp. 3d 612, 618 (E.D.N.C. 2017)

23

(considering alleged registration rates in excess of 104%); *Martinez-Rivera*, 166 F. Supp. 3d at 801–03 (considering an alleged registration rate of 105%).[12]

Colorado's registration numbers may not be unreasonably high in context or there may be a reasonable explanation for them, as the Secretary argues.  But at the motion to dismiss stage, the Court does not "weigh potential evidence that the parties might present at trial"; rather, its task is to "assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted."  *See Strauss v. Angie's List*, 951 F.3d 1263, 1267 (10th Cir. 2020) (quoting *Peterson v. Grisham*, 594 F.3d 723, 727 (10th Cir. 2010)).  Thus, while it is true that plaintiffs do not provide information on how many other states have a comparable registration rate, which could show how Colorado's rate compares with other states', such allegations are not required to plausibly allege that the Secretary has not done a reasonable job maintaining voter lists.  Thus, while the 2018 EAC Report may help to provide context at summary judgment or trial, considering it at this stage to rebut plaintiffs' allegations would result in the Court weighing the parties' evidence, which is inappropriate.

Plaintiffs also report the number of voters Colorado counties have removed from voter lists for not responding to a Confirmation Notice and then not voting in two general

---

[12] In reply, the Secretary seeks to distinguish these cases because they were brought against counties using county-level data, while here plaintiffs are using county-level data to state a claim against a state.  *See* Docket No. 44 at 8.  It is true that *Voter Integrity Project* and *Martinez-Rivera* are not entirely analogous to this case.  However, it is not clear why county-level data would not be relevant to plaintiffs' claim, as the NVRA requires each state to conduct a general program that makes a reasonable effort to remove the names of ineligible voters, *see* 25 U.S.C. § 20507(a)(4), and the maintenance program requires county clerks to send Confirmation Notices and mark voters who do not respond as "inactive."  *See* Docket No. 34 at 2–3 (citing Colo. Rev. Stat. §§ 1-2-302.5(1), 1-2-302.5(2)(a), 1-2-302.5(2)(b)(3)).

elections.  Docket No. 1 at 8–9, ¶¶ 37–41.  According to plaintiffs, the 2018 EAC Report shows that 30 Colorado counties reported removing fewer than 3% of voters through the NCOA Process, even though, on plaintiffs' reading of the Census data, 18% of Coloradans were not living in the same house as a year ago.  *Id.* at 8, ¶¶ 38–39.  Plaintiffs then allege that this data "indicate[s] an ongoing, systemic problem with [Colorado's] voter list maintenance efforts" because the removal rate is "too low to comply with NVRA's reasonable efforts requirement."  *Id.* at 9, ¶¶ 41–42.

The Secretary responds that plaintiffs' representation of the EAC data does not take into account other explanations for the state not removing the full 18% of voters from the rolls, such as death and moving outside the county but within the state.  Docket No. 34 at 13–14.  The Secretary also argues that plaintiffs fail to explain why 30 counties removing fewer than 3% of registrants is "too low," how Colorado's figures compare to other states', or what an acceptable percentage of voters removed through the NCOA Process would be.  *Id.* at 12–15.  While it may ultimately be proven that Colorado's figures are reasonable when compared to other states' figures, making such a determination at the motion to dismiss stage would be improper without the benefit of expert testimony on what constitutes a reasonable program or what the comparative data means.  *See, e.g.*, *Bellitto v. Snipes*, 935 F.3d 1192, 1197 (11th Cir. 2019) (discussing "extensive" expert testimony on registration rates, list maintenance tools, and what constituted a reasonable effort).  Instead, the Court determines whether plaintiffs' well-pled allegations, presumed to be true, state a plausible claim.  The Court finds that they do.

Plaintiffs state that, while Colorado may be availing itself of the NVRA's safe

harbor, Colorado may not actually be implementing it.  Docket No. 35 at 13.  Ultimately, the safe-harbor defense, plaintiffs argue, "raises factual matters outside the complaint and is not appropriate to consider on this motion."  *Id.* at 12.  The Secretary states that Colorado law requires the Secretary to first search the NCOA database for all voters still registered in Colorado who may have moved and then to transmit the data to county clerks, who send Confirmation Notices and, if the voter does not respond to the Confirmation Notice, mark the voter as "inactive."  Docket No. 34 at 2–3 (citing Colo. Rev. Stat. §§ 1-2-302.5(1), 1-2-302.5(2)(a), 1-2-302.5(2)(b)(3)).  If a voter fails to either return a Confirmation Notice or to vote in two general elections, the voter's registration is cancelled.  *Id.* at 3 (citing Colo. Rev. Stat. § 1-2-302.5(2)(b)(III)(B)).  While it appears undisputed that this is Colorado's program, the Court has no information about Colorado's compliance, and the Court finds that determining whether Colorado has availed itself of the safe harbor cannot be resolved without "further development of the record."  *See Voter Integrity Proj.*, 301 F. Supp. 3d at 620 ("Whether [the county's] compliance is sufficient to satisfy the 'safe harbor' provision is best resolved after further development of the record."); *Bellitto v. Snipes*, 221 F. Supp. 3d 1354, 1366 (S.D. Fla. 2016) (whether a letter from defendant election official "establishes [] full compliance with subsection (c)(1) and defeats [p]laintiff's claims is a fact-based argument more properly addressed at a later stage of the proceedings" not on a motion to dismiss).

## IV.  CONCLUSION

For the foregoing reasons, it is

**ORDERED** that defendants' Motion to Dismiss [Docket No. 34] is **GRANTED in**

**part** and **DENIED** in part. It is further

   **ORDERED** that all claims against the State of Colorado are **DISMISSED without prejudice**.

   DATED August 16, 2021.

        BY THE COURT:

        PHILIP A. BRIMMER
        Chief United States District Judge