**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:20-cv-02992-PAB

JUDICIAL WATCH, INC., *et al.*

    Plaintiffs,

v.

JENA GRISWOLD, Colorado Secretary of State, in her official capacity, *et al.*,

    Defendants.

**BRIEF OF AMICI CURIAE IN SUPPORT OF DEFENDANT'S MOTION FOR
RECONSIDERATION**

Amici Curiae Voto Latino and Vote.org (collectively, "Amici") file this brief in support of Defendant's Motion for Reconsideration, ECF No. 62. In sum, Amici support dismissal of this case with prejudice pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) on the grounds that Plaintiffs lack standing and have failed to state a claim upon which relief may be granted. The arguments below are only bolstered by the Supreme Court's recent decision in *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021).

## I.    INTRODUCTION

Plaintiffs Judicial Watch, Elizabeth Miller, Lorri Hovey, and Mark Sutfin (collectively, "Plaintiffs") brought this case in an attempt to force Colorado to take more aggressive measures to remove voters from its rolls. Plaintiffs couch their challenge as an alleged failure to comply with Section 8(a)(4) of the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20507(a)(4). But there are no NVRA violations here. The voter list maintenance process required under Colorado law and codified in statute and regulation satisfies the NVRA, which expressly provides that a state "may meet the requirement of subsection (a)(4) by establishing a program" that utilizes

change-of-address information from the United States Postal Service. Colorado has established such a program and has removed hundreds of thousands of voters from the rolls in accordance with its governing laws in just the last two years. Plaintiffs' complaint does not even mention the relevant Colorado law, much less make a plausible case that it runs afoul of the NVRA. More fundamentally, Plaintiffs fail to establish that they have Article III standing to pursue their claims. The Court should accordingly dismiss the case under Rule 12(b)(1) for lack of jurisdiction or, in the alternative, under Rule 12(b)(6) for failure to state a claim.

## II.   BACKGROUND

### A.   The National Voter Registration Act

Congress enacted the NVRA "primarily to increase the number of citizens eligible to vote in elections for federal office." *Dobrovolny v. Neb.*, 100 F. Supp. 2d 1012, 1030 (D. Neb. 2000). In doing so, Congress found that "the right of citizens of the United States to vote is a fundamental right" and "discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation in elections for Federal office and disproportionately harm voter participation by various groups, including racial minorities." 52 U.S.C. § 20501(a).

Chief among the concerns that prompted the NVRA was voter purging—states' unceremonious cancelations of eligible voters' registrations in a way that "violate[d] the basic rights of citizens," a practice that has a particularly detrimental impact on the voting rights of Americans from "minority communities." S. Rep. No. 103-6, 18 (1993). To prevent improper voter purging, the NVRA regulates and limits the circumstances under which a state may remove registrants from the voter registration rolls. *See, e.g.*, *Bellitto v. Snipes*, 935 F.3d 1192, 1201 (11th Cir. 2019) ("Congress sought to increase voter registration and to limit purging efforts that could

impede the exercise of the franchise, while at the same time ensuring that voter rolls remain accurate and current").

Section 8(a)(4) of the NVRA, the voter list maintenance requirement, requires states to "conduct a general program that makes a reasonable effort" to remove the names of voters who have become ineligible because they relocated or died. 52 U.S.C. § 20507(a)(4). While the NVRA does not define "reasonable effort," Section 8(c) details a process for states to satisfy their obligations under Section 8(a)(4): by "establishing a program" that uses information from the United States Postal Service's ("USPS") National Change of Address database to identify registrants whose addresses may have changed and sends address confirmation notices to these voters (the "NCOA process"). *Id.* § 20507(c). The NCOA process operates as a "safe harbor": if a state establishes such a program then it has, as a matter of law, made "a reasonable effort" to remove voters who became ineligible because of relocation in compliance with Section 8(a)(4) NVRA. *Bellitto*, 935 F.3d at 1205.

Beyond these provisions, and to further its purpose of increasing voter participation and preventing unconstitutional voter purging, the NVRA strictly limits states' cancellations of voter registrations. Under the NVRA, a county cannot cancel a voter's registration based on relocation unless (i) the county receives written notice from the voter that she has moved outside the jurisdiction or (ii) the county receives information that the voter's residence has changed, the voter fails to respond to a notice of address confirmation from the county regarding the change in residence, *and* the voter fails to vote in two consecutive federal general elections after the county's notice. 52 U.S.C. § 20507(d). As a result, and because federal general elections occur every two years, if a voter fails to respond to a notice of address confirmation, the voter's name must remain

- 3 -

on the rolls for at least two years after the notice issued. *Id.*

## B.     The NCOA Process in Colorado Law

Colorado implements the requirements of the NVRA through the Secretary of State (the "Secretary") and the individual counties. The Secretary oversees the conduct of elections and the coordination of the State's duties under the NVRA. C.R.S. § 1-1-107. For their part, the counties manage their residents' voter registrations through the statewide voter registration list database. *See, e.g.*, C.R.S. §§ 1-1-110, 1-2-302.

Colorado has established and codified, in statute and regulation, NVRA Section 8(c)'s "clearly delineated procedure to comply with its statutory obligations concerning change of address." *Bellitto*, 935 F.3d at 1204; *see also* C.R.S. § 1-2-302(3.5), 1-2-302.5; 8 C.C.R. § 15015-1:2.13 ("List Maintenance under section 8 of the National Voter Registration Act of 1993").[1]

Under Colorado's NCOA process, the Secretary conducts a monthly search in the NCOA database to identify voters who have moved, C.R.S.§ 1-2-302.5(1), and also receives a daily file from the Colorado Department of Revenue showing every resident who has either received a new driver's license or updated current address information, *id.* § 1-2-213. *See also* 52 U.S.C. § 20507(c)(1). The Secretary provides this information to the counties. C.R.S. § 1-2-302.5(2). If the Secretary's information indicates the voter has moved out of state, the county where the voter is registered marks the voter as "inactive" in the statewide voter registration database and sends an address confirmation card to the voter's registration address. *Id.* § 1-2-302.5(2)(b)(III); *id.* § 1-2-

---

[1] Plaintiffs' Complaint relies on purported data relating to voters who allegedly become ineligible because they relocated. Plaintiffs do not allege or cite data to suggest that Colorado has failed to make a reasonable effort to remove the names of deceased voters. In any event, Colorado statutes also require the Secretary to coordinate the voter list with agency death records, *see* C.R.S. § 1-2-302(3.5)(a), and Plaintiffs make no allegation that the Secretary has not done so.

603(2); *see* 52 U.S.C. §§ 20507(c)(1)(B)(ii), (d)(2).

Inactive voters, unlike active voters, do not automatically receive their ballots by mail. C.R.S. § 1-7.5-107(3)(a)(I). An inactive voter's registration is cancelled once the voter fails to vote in two consecutive general elections. *Id.* § 1-2-302.5(2)(b)(III)(B); 52 U.S.C. § 20507(d)(1)(B)(ii). An inactive voter is still able to vote in person, but only after completing a signature card with their current address. C.R.S. § 1-2-605(3); *id.* § 1-7-110(1)(a); 52 U.S.C. § 20507(d)(2)(A). Colorado law directly tracks the NVRA and provides no additional limitations on the cancellation of a voter's registration other than those required by the NVRA—if the NVRA permits cancellation, so does Colorado law.

### C. The Present Case

Making no mention of any of the laws or regulations that govern Colorado's list maintenance program, Plaintiffs allege that Colorado violates NVRA Section 8(a)(4) by baldly asserting that Colorado fails to "conduct a general program that makes a reasonable effort to cancel the registrations of registrants who are ineligible to vote in Colorado's federal elections." Compl. ¶ 73, ECF No 1. The complaint seeks a permanent injunction ordering Defendants to "develop and implement a general program that makes a reasonable effort to remove the registrations of ineligible registrants from the voter rolls in Colorado." *Id.* at 14, ¶ c. Intervenors now move to dismiss because the complaint does not state a claim for relief and because Plaintiffs lack standing.

### III.  LEGAL STANDARD

Dismissal is appropriate under Federal Rule of Civil Procedure 12(b)(1) if the Court lacks subject-matter jurisdiction over the claims alleged in the Complaint. Challenges based on a plaintiff's Article III standing fall under Rule 12(b)(1). *See Baker v. USD 229 Blue Valley*, No. 20-

3054, 2020 WL 6437964, at *3 (10th Cir. Nov. 3, 2020).

Under Rule 12(b)(6), a case should be dismissed if the facts in the complaint, accepted as true, do not support the plaintiff's legal claim to entitle the plaintiff to relief. *Sutton v. Utah State Sch. for Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999). "The court's function on a Rule 12(b)(6) motion is . . . to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Miller v. Glanz*, 948 F.2d 1562, 1565 (10th Cir. 1991). To withstand a Rule 12(b)(6) motion, it must be "plausible and not merely possible that the plaintiff is entitled to relief under the relevant law." *Christy Sports, LLC v. Deer Valley Resort Co*., 555 F.3d 1188, 1192 (10th Cir. 2009).

## IV.  ARGUMENT

### A.  The Court should dismiss Plaintiffs' case for lack of subject-matter jurisdiction because Plaintiffs do not have Article III standing.

Plaintiffs cannot satisfy the "irreducible constitutional minimum" of standing because they have not alleged that they have experienced an injury in fact sufficient under Article III. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). An injury in fact is an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. *Id.* at 560. Conjectural, hypothetical injuries—those that require the court to make logical leaps and assume the development of a situation that is not borne out by the facts—cannot provide the basis for standing. *See id.* at 571. Yet conjectural and hypothetical injuries are all that Plaintiffs have alleged here. As such, their complaint fails to satisfy Article III and must be dismissed.

### 1.     Judicial Watch has not suffered an injury in fact.

The complaint does not demonstrate that Judicial Watch has been directly injured in fact because it has not adequately alleged any cognizable harm to itself. Although it attempts to allege a diversion of resources injury to it as an organization, Judicial Watch fails to allege that it diverted resources to counteract harm that perceptibly impaired the organization's ability to carry out its mission. Instead, Judicial Watch alleges that it has been injured by having to expend resources "to investigate, address, research, and counteract Defendant's failure to comply with their NVRA voter list maintenance obligations," which were diverted from "[its] regular, programmatic activities" or which would not have been expended "at all." Compl. ¶¶ 61-63. These allegations are insufficient to support standing.

Importantly, Judicial Watch fails entirely to explain whether or how it had to divert resources to programs designed to counteract any purported injury to its organizational interests, other than to the investigation that led to this litigation. But the "diversion of resources to litigation or investigation in anticipation of litigation" on its own "does not constitute an injury in fact sufficient to support standing." *Equal Rts. Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1140 (D.D.C. 2011). To hold otherwise would permit plaintiffs to "manufacture standing" and impermissibly "secure a lower standard for Article III standing," *Clapper for Amnesty Int'l USA*, 568 U.S. 398, 416 (2013), based on nothing more than an organization's abstract policy interest, or its interest in determining whether the government is following the law. It is well established that neither of these interests, by themselves, are sufficient to satisfy Article III standing. *See, e.g.*, *Sierra Club v. Morton*, 405 U.S. 727, 738-39 (1972) (finding "a mere 'interest in a problem,' no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem,

is not sufficient by itself" to confer standing); *see also Lujan*, 504 U.S. at 573-74 ("We have consistently held that a plaintiff raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy.").

### 2. The individual plaintiffs and Judicial Watch's Colorado members have not suffered an injury in fact.

Plaintiffs have also failed to demonstrate that Defendant's alleged conduct directly injures the individual plaintiffs or Judicial Watch's members who are Colorado voters. Instead of pleading facts to support the allegation that these individual voters have suffered particularized, concrete injuries, Plaintiffs assert that Defendant's conduct "undermin[es] their confidence in the integrity of the electoral process, discourage[es] their participation in the democratic process, and instill[s] in them the fear that their legitimate votes will be nullified or diluted." Compl. ¶ 65. These alleged injuries cannot constitute an injury in fact because they are hypothetical and conjectural. And even assuming these injuries were concrete, they would be insufficient to establish standing because they are generalized grievances shared by voters across Colorado.

To start, these alleged injuries are not particularized to the individual plaintiffs or Judicial Watch's members. The individual plaintiffs and Judicial Watch's members have no more interest in confidence in election integrity, avoiding discouragement from participating in the electoral process, or avoiding the dilution of their votes than does "every citizen[] . . . in proper application of the Constitution and laws." *Lujan*, 504 U.S. at 573. Plaintiffs' vote dilution allegation and the other alleged injuries would affect *all* Colorado voters, not merely Plaintiffs. *See, e.g.*, *Bognet v. Sec'y Commonwealth of Pennsylvania*, No. 20-3214, 2020 WL 6686120, at *12 (3d Cir. Nov. 13,

2020) ("Put another way, [a] vote cast by fraud or mailed in by the wrong person through mistake, or otherwise counted illegally, has a mathematical impact on the final tally and thus on the proportional effect of every vote, but no single voter is specifically disadvantaged. . . . Such an alleged "dilution" is suffered equally by all voters and is not "particularized" for standing purposes. The courts to consider this issue are in accord." (quotations and citations omitted)). Plaintiffs seek relief "that no more directly and tangibly benefits [them] than it does the public at large," and therefore the alleged injury cannot constitute an injury in fact. *See Lujan*, 504 U.S. at 574; *see also Bognet*, 2020 WL 6686120 at \*12-\*14; *Bd. of Cnty. Comm'rs of Sweetwater Cnty. v. Geringer*, 297 F.3d 1108, 1112 (10th Cir. 2002) ("[T]he plaintiff's claim must not be a generalized grievance shared in substantially equal measure by all or a large class of citizens." (quotations omitted)). Accordingly, these injuries are impermissibly generalized grievances that cannot support standing.

Beyond being generalized, Plaintiffs' discussion of individual voters' injuries is conjectural at best and patently false at worst. Plaintiffs' vote-dilution theory requires the Court to find, "by surmise or guesswork" and "without proof or sufficient evidence," *see* CONJECTURE, Merriam-Webster Dictionary, not only that ineligible voters are currently on the voter rolls in Colorado—a point that Plaintiffs do not actually allege in the complaint—but also that those hypothetical ineligible voters will improperly cast ballots in future elections *and* that those ballots will be cast for opponents of the candidates for whom the individual plaintiffs vote. Because "[t]his parade of horribles may never come to pass," Plaintiffs' allegations are too conjectural to constitute an injury in fact. *Bognet*, 2020 WL 6686120 at \*16 (internal quotations and citations omitted). Indeed, because a claim of vote dilution by fraud is inherently generalized and speculative, courts

- 9 -

across the country have rejected it on standing grounds. [2] *See also id.* at *12 (collecting cases). And the allegation that the individual plaintiffs will suffer imminent injury by being discouraged from participating in the electoral process is flatly contradicted elsewhere in the complaint, which notes that each individual plaintiff is a registered voter in Colorado who *intends to vote* in their counties of residence. Compl. ¶¶ 5-7.

Because Plaintiffs fail to allege an injury in fact sufficient to satisfy Article III, they necessarily fail to establish that an injury was caused by Defendants or is redressable by this Court. The complaint should be dismissed for lack of subject-matter jurisdiction.

**B.     The Court should dismiss Plaintiffs' case because the complaint does not contain allegations supporting a claim for which relief can granted.**

   **1.     Plaintiffs do not have statutory standing.[3]**

Plaintiffs lack statutory standing to bring this case because they failed to give notice to Defendants before bringing suit, as is required by the NVRA. As a threshold matter, "[d]espite the [NVRA's] apparent permissive language, no standing is conferred without proper written notice." *Am. Civil Rights Union v. Martinez-Rivera*, 166 F. Supp. 3d 779, 806 (W.D. Tex. 2015); *see also* 52 U.S.C. § 20510(b). There is an exception to the notice requirement "[i]f the violation occurred

---

[2] *See, e.g.*, *Donald J. Trump for President, Inc. v. Way*, Civil Action No. 20-10753 (MAS) (ZNQ), 2020 WL 6204477, at *6 (D.N.J. Oct. 22, 2020); *Donald J. Trump for President, Inc. v. Boockvar*, No. 2:20-cv-966, 2020 WL 5997680, at *59 (W.D. Pa. Oct. 10, 2020); *Donald J. Trump for President, Inc. v. Cegavske*, No. 2:20-CV-1445 JCM (VCF), 2020 WL 5626974, at *4 (D. Nev. Sept. 18, 2020); *Martel v. Condos*, No. 5:20-cv-131, 2020 WL 5755289, at *4 (D. Vt. Sept. 16, 2020); *Paher v. Cegavske*, 457 F. Supp. 3d 919, 926–27 (D. Nev. 2020); *Am. Civ. Rts. Union v. Martinez-Rivera*, 166 F. Supp. 3d 779, 789 (W.D. Tex. 2015).

[3] "[D]ismissal for lack of statutory standing is effectively the same as a dismissal for failure to state a claim, and a motion to dismiss on this ground is brought pursuant to Rule 12(b)(6), rather than Rule 12(b)(1)." *Leyse v. Bank of Am. Nat'l Ass'n*, 804 F.3d 316, 320 (3d Cir. 2015) (quotations and citations omitted).

within 30 days before the date of an election for Federal office." 52 U.S.C. § 20510(b)(3).

Plaintiffs do not allege that they provided proper written notice to Defendants before filing this suit, and the exception does not save the complaint. Plaintiffs assert that "[b]ecause the violations set forth herein occurred within 30 days before the date of a federal election, no notice is required prior to filing this action." Compl. ¶ 72. This conclusory allegation is unavailing. As discussed below, Plaintiffs allege no facts indicating that Defendants violated the NVRA at all, *see infra* at IV.B.3, much less within 30 days of the election by failing to cancel voter registrations. Moreover, Plaintiffs cannot make such allegations because the NVRA *prohibits* Defendants from cancelling voter registrations within 90 days of the election. 52 U.S.C. § 20507(c)(2)(A). Plaintiffs cannot argue in good faith that Defendants *violated* the NVRA by failing to purge the voter rolls within 30 days of the election when to do so would violate the NVRA's prohibition on cancelling registrations within 90 days of the election.

### 2. Plaintiffs' failure to allege that Colorado does not comply with the NVRA's safe-harbor provision is fatal to their complaint.

Plaintiffs' complaint should also be dismissed pursuant to Rule 12(b)(6) because the NVRA itself forecloses Defendant's liability. Conspicuously left out of the complaint is the fact that the NVRA includes a statutory safe harbor—Section 8(c)'s NCOA process, *id.* § 20507(c)— the adoption of which satisfies a state's obligations under Section 8(a)(4). *See Bellitto*, 935 F.3d at 1203-05. Plaintiffs fail to mention that Colorado has adopted Section 8(c)'s NCOA process, and they do not allege that Defendants are not complying with that process. They do not allege that Defendants fail to regularly check the National Change of Address database to identify voters who have moved, C.R.S. § 1-2-302.5(1), to receive a daily file from the Colorado Department of Revenue showing every resident who has either received a new driver's license or updated current

address information, *id.* § 1-2-213, or to forward this information to the counties for address verification notices to be issued, *id*. § 1-2-302.5(2). These omissions doom the complaint's viability. *See Public Interest Legal Foundation v. Boockvar*, --- F. Supp. 3d ---, No. 1:20-CV-1905, 2020 WL 6144618, at *3 (M.D. Pa. Oct. 20, 2020) (M.D. Penn. Oct. 20, 2020) ("Plaintiff does not allege that this program itself is deficient, nor does it point to a specific breakdown that makes the program 'unreasonable.' . . . Without allegation, let alone proof, of a specific breakdown in Pennsylvania's voter registration system, we cannot find that the many procedures currently in place are unreasonable.").

Plaintiffs' sole claim is that Defendants are violating the NVRA's list-maintenance requirements, but Defendant's undisputed implementation of the NVRA's safe-harbor NCOA process "constitutes a reasonable effort at identifying voters who have changed their addresses." *Bellitto*, 935 F.3d at 1205. Because Defendants are firmly anchored in Section 8(c)'s safe harbor, Plaintiffs' case should be dismissed for failure to state a claim upon which relief can be granted.

### 3. Plaintiffs' factual allegations do not support a plausible claim for relief.

Plaintiffs' complaint should be dismissed not just because of its glaring omission of Defendant's implementation of the NVRA's statutory safe harbor, but also because of the immateriality of its factual allegations. Plaintiffs' allegations rely on an amalgamation of old data points from which one cannot plausibly infer that Defendants are currently violating the NVRA. In considering whether Plaintiffs' factual allegations satisfy Rule 12(b)(6), the court must "ask whether [the statistical allegations] nudge[] [Plaintiffs'] claims across the line from conceivable to plausible." *Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038, 1053 (10th Cir. 2020) (quotations omitted). The answer to that question here is a resounding "no." Plaintiffs base their

case on four alleged calculations—each based on undisclosed numbers—that do nothing to nudge their claim from merely conceivable to plausible.

*First*, Plaintiffs compare outdated registration data from one source (the U.S. Election Assistance Commission Report) with outdated residency data from another (the Census Bureau's population estimate from 2013 to 2018), conduct some veiled arithmetic, and allege that certain counties in Colorado had registration rates that exceeded 100% of their voting age populations *more than two years ago*. *See* Compl. ¶¶ 21-35. Even if these uncorroborated numbers were accurate, they say nothing about the *current* registration rates in each Colorado county and therefore do not bear on the *current* efficacy of Defendant's NCOA process. Moreover, the complaint relies on data about the over-18 population, ignoring 17-year-old Coloradans registered to vote. *Id.* ¶ 24; C.R.S. § 1-2-101. Plaintiffs also ignore that even if there had been registration rates in certain counties between 2013 and 2018 that exceeded 100%, by the end of 2018 Colorado had removed 289,247 ineligible voters—more than 7% of its registered voters—from its voter list. U.S. Election Assistance Commission, *Election Administration and Voting Survey*, 82 (2019).[4]

*Second*, Plaintiffs point to "low numbers of removals" from Colorado's voter list and allege that "[a] removal rate below 1.5% per year . . . is too low to comply with the NVRA's reasonable effort requirement." Compl. ¶¶ 36-42. But without providing any information as to how many voters *should* have been removed from the voter list (a number not provided by Plaintiffs), these

---

[4] If a document "is referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be considered on a motion to dismiss." *See GFF Corp. v. Associated Wholesale Grocers, Inc*., 130 F.3d 1381, 1384 (10th Cir. 1997). This resource is available online at https://www.eac.gov/sites/default/files/eac_assets/1/6/2018_EAVS_Report.pdf#page=91. *See O'Toole v. Northrop Grumman Corp.,* 499 F.3d 1218, 1225 (10th Cir. 2007) ("It is not uncommon for courts to take judicial notice of factual information found on the world wide web.").

numbers are meaningless and cannot support a conclusion that the rate is too low or, more critically, that Defendants are violating the NVRA. Indeed, as discussed *supra* at IV.B.2, Colorado's statutory scheme tracks the NVRA's safe harbor provision, which demonstrates compliance with the NVRA. Nothing in the complaint alleges anything to the contrary.

Moreover, Plaintiffs' removal-rate data is inherently flawed as it compares census information about residents "living in the same house as a year ago" to the number of registration removals. Compl. ¶ 39. Not only are the data outdated, but Plaintiffs conflate "residents" with "registered voters" and assume that anybody living in a different house moved to a different voting jurisdiction. Data about the number of moves by *residents*—a much larger group that includes minors and non-citizen—are uninformative about how many *registered voters* changed homes. Moreover, data about the number of people who changed homes are uninformative about how many moved to a different voting jurisdiction. To be informative, a removal rate would consider the number of *registered voters* who moved to a *different jurisdiction*. But Plaintiffs calculate a rate using a different, and much larger, number. As a result, their rate is meaningless.

*Third*, Plaintiffs allege that "low numbers of address confirmation notices [are] sent to Colorado registrants" and make the conclusory assertion that a jurisdiction "cannot be compliant with the NVRA" if it "sends relatively few such notices." *Id.* ¶¶ 43-48. Again, these numbers mean nothing without context, which Plaintiffs fail to provide. And, again, Plaintiffs rely on inapposite data, pointing to unspecified "recent census data" purportedly showing that 9% to 24% of residents in counties with "low" numbers of address confirmation notices reported not living in the same house as a year ago. *Id.* ¶ 40. But these numbers conflate *residents* with *registered voters* and include residents who are not of voting age or are otherwise ineligible. Plaintiffs' data also do not

reveal how many residents—let alone registered voters—moved to a different jurisdiction. As a result, the allegation about "low" registration notices cannot support an inference that Defendants have not made a reasonable effort under Section 8(a)(4) of the NVRA.

*Fourth*, Plaintiffs claim that some counties have "high inactive registration rates," and make the conclusory assertion that "[h]aving a high percentage of inactive registrations" indicates a violation of the NVRA. *Id*. ¶¶ 49-57. In fact, the opposite is likely true. Voters become inactive when they fail to respond to the statutory notice. *See* C.R.S. § 1-2-302.5(2)(b)(III); *id*. § 1-2-603(2); *see also* 52 U.S.C. § 20507(c)(1)(B)(ii); *id.* § 20507(d)(2). And the NVRA bars states from cancelling a voter's inactive registration until that voter has failed to cast a ballot in two general elections after receiving the notice. As a result, the more diligent a state is about reviewing information on voter relocation and sending out address confirmation notices, the more inactive voters the state will have. A high rate of inactive voters is the natural consequence of the NVRA's NCOA process, which Colorado has adopted. *See supra* II.B.

For these reasons, Plaintiffs' factual allegations do not plausibly support their claim that Defendants have failed to make reasonable efforts to comply with the NVRA and, therefore, the complaint should be dismissed.

## V. CONCLUSION

For the aforementioned reasons, Amici respectfully request that the Court grant Defendant's Motion for Reconsideration.

| | |
|---|---|
| Dated this 20th of November | Respectfully submitted, |

                                                    *s/ Kathryn E. Yukevich*
                                                    Marc E. Elias
                                                    Elisabeth C. Frost
                                                    Kathryn E. Yukevich
                                                    **ELIAS LAW GROUP LLP**
                                                    10 G Street NE, Suite 600
                                                    Washington, D.C. 20002
                                                    Telephone: (202) 968-4490
                                                    melias@elias.law
                                                    efrost@elias.law
                                                    kyukevich@elias.law

                                                    Matthew P. Gordon
                                                   **Perkins Coie LLP**
                                                    1201 Third Avenue
                                                    Suite 4900
                                                    Seattle, WA 98101-3099
                                                    Telephone: 206-359-3321
                                                    Email: mgordon@perkinscoie.com

                                                    Lindsey E. Dunn, Colorado Bar No. 49547
                                                    **PERKINS COIE LLP**
                                                    1900 Sixteenth Street, Suite 1400
                                                    Denver, Colorado 80202
                                                    Telephone: (303) 291-2300
                                                    Email: ldunn@perkinscoie.com

                                                    *Attorneys for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on November 20, 2021, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following individuals:

    Peter G. Baumann
    Eric William Payne Lee
    Eric Robert Holway
    T. Russell Nobile
    Grant T. Sullivan
    John Stuart Zakhem


By: *s/ Kathryn E. Yukevich*


*Attorney for Amici Curiae*